UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BERNARD F. CAMPBELL,

       Plaintiff,

v.                                                    Case No.  8:11-cv-377-T-35TBM

ERIC K. SHINSEKI,
Secretary of Department of Veterans
Administration,

       Defendant.

## DEFENDANT'S RENEWED AND AMENDED MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

COMES NOW Defendant Eric K. Shinseki, in his official capacity as Secretary of Department of Veterans Administration ("Defendant"), by and through the undersigned Assistant United States Attorney, and hereby files this renewed and amended motion for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure, and this Court's Order, dated June 2, 2012 (Doc.  9) and in support thereof states the following:

## STATEMENT OF UNDISPUTED FACTS

1.    On October 13, 2009, Bernard F. Campbell (Campbell) was hired as a student in the Clinical Pastoral Education (CPE) program as a resident at the James

A. Haley Veterans' Hospital, in Tampa, Florida. (Ex. 14A[1], 156; Ex. 11)[2] The position was for a one-year term. (Ex. 14A, 156)  Campbell identified himself as a Black male. (Ex. 13A, 120,122)  Campbell identified his religion as Pentecostal Conservative Charismatic. (Ex. 13A, 122).

2.       Brenda Wallace (Wallace) was Campbell's educational supervisor in the CPE program.  Campbell identified Wallace as his "immediate supervisor."  (Ex. 13A, 119)  Wallace identified herself as an African-American female.  (Ex. 15A, 170) Wallace identified her religion as American Baptist and was going through the process to be ordained as a UCC (United Church of Christ) minister. (Ex. 15A, 171).

3.       James Taylor (Taylor) was the VISN 8 CPE Program Director[3] and Chief Chaplain.  Taylor was the supervisor for all personnel in the Chaplain Service, including Campbell's direct supervisor (Wallace). Taylor had limited contact with Campbell, but was aware of his daily activities through Wallace.  Taylor identified himself as a Caucasian male. (Ex. 14A, 154)  Taylor identified himself as a Protestant. (Ex. 14A, 155).

4.       Along with Campbell, there were three other CPE student chaplains in

---

[1]      Exhibits 13A through 18A replace Exhibits 13 through 18 filed with the previous motion for summary judgment.  Exhibits 13A  through 18A are excerpts of sworn testimony given by Bernard Campbell (13A), James Taylor (14A), Brenda Wallace (15A), Loreen O'Brien (16A), Karen Morris (17A) and Cary Young (18A).  Each exhibit now contains the page reflecting that the testimony was given under oath, which was not previously part of the exhibits.

[2]      Exhibits are cited as, e.g. (Ex.3, 202), referencing Exhibit 3, page 00202 or 202.

[3]      VISN - Veterans Integrated Service Network, Region 8.

the CPE program.  The other student chaplains were Loreen O'Brien, Karen Morris and Cary Young. (Ex.16A, 200; Ex. 17A, 224; Ex. 18A, 236-237)  The four student chaplains shared a chaplain resident office with four desks. (Ex. 16A, 207).

5.     Loreen O'Brien (O'Brien) identified herself as a Caucasian female. O'Brien identified her religion as Christian. (Ex. 16A, 200).

6.     Karen Morris (Morris) identified herself as a White female.  Morris identified her religion as Christian. (Ex. 17A, 224-225).

7.     Cary Young (Young) identified herself as a Caucasian female.  Young identified her religion as Presbyterian. (Ex. 18A, 236-237)

8.     The James A. Haley Veterans' Hospital has an "Admissions Policy" for the CPE program that provides, in pertinent part, that "[a]t all levels, the CPE student needs to sustain sufficient physical and emotional health to deliver pastoral care.  The student must demonstrate the capacity to consistently establish and maintain relationships at significant levels and be open to learning, change and growth." (Ex. 8, 275)[4]

9.     The James A. Haley Veterans' Hospital has a "Code of Conduct for Employees and Trainees" that provides, in pertinent part:

> **2. POLICY:** The James A. Haley Veterans' Hospital has a zero tolerance for disruptive and intimidating behavior that undermines a safe patient environment.  All employees of the Hospital are expected to refrain from engaging in disruptive behaviors.  Disruptive behavior

---

[4]     See Declaration of Authentication of Business Records of Mildred Molina, U.S. Department of Veterans Affairs (Exhibit 19), authenticating Defendant's Motion for Summary Judgment Exhibits 1, 3, and 6 through 11.

includes verbal and non-verbal actions that intimidate staff or patients.

(Ex. 9, 277)

### 5. PROCEDURES:

c. Employees who witness behavioral outbursts that violate the code of conduct are responsible to report this to their supervisor. . . .

d. . . . A Report of Contact form (VAF-119) may be used.

(Ex. 9, 277-280)

10.    On November 3, 2009, Loreen O'Brien filed a "Report of Contact"

(VAF-119) regarding intimidating behavior toward her by Campbell on that date.

O'Brien wrote in the Report of Contact:

On Tuesday, November 3, 2009, at approximately 4:45 p.m., I was in the Chaplain Residents office. Also present at this time were Chaplain Residents Carey Young and Bernard Campbell. We had just concluded a didactic and group session with our supervisor Brenda Wallace. This meeting ran late, normally ending at 4:00, because Bernard insisted that he needed to continue his concerns from the previous Friday's session. Once back in the resident's office, Bernard, in the presence of Carey Young and myself, continued to vent his frustration as he has done in the meeting. Both Carey and I attempted to assure Bernard that we both had stayed late in the supervised meeting because he wanted to be heard and were willing to hear his concerns in hopes of acquiring further understanding.

Around 4:50 p.m., Carey gathered her belongings and left to go home. It was during this time that Bernard became, seemingly, even more frustrated saying that "This is all about all of you, including Brenda, trying to indoctrinate me into your theology! That is what it is!" He was raising his voice at this point. I responded by saying it would be best to continue this in the next group setting. Bernard continued though in a ranting fashion. The custodian, Steve, approached the office but without Bernard seeing him, made eye contact with me and asked if everything was okay. I told him yes and thank you, because although I did feel threatened, I knew I was about to leave to go home. Bernard started again, emphatically, with his opinions. I interjected and stated, "Look Bernard, what I heard us asking you during our meeting

4

was all focused on questions of personal growth and learning, not on one person's theology versus another's. In fact, the rest of the members of our group have not even verbalized our own individual theologies yet, so I'm not sure I understand, how you can say we are all trying to 'indoctrinate' you into our theology."

Bernard moved and stood between me and the doorway of the office, glared at me, and pointing his finger at me said in a very loud voice, "You don't want to deal with the truth of the Bible. You personally, do you Loreen. I mean, your personal life. Are you married? You're not, are you. What's going on there? You're not married, so what is it? See, you don't want to deal with the truth of the Bible, do you!" He was leaning closer to me, only a couple of feet away. I suddenly felt I was being personally harassed and found his body language, tone, and words to be aggressive and threatening. I said, "Bernard, I will not speak to you anymore outside the group because you are too aggressive towards me." At that point, I turned over a business card lying on my desk and wrote down exactly what I had said to him, with Bernard watching me write it. I then said, "Bernard, I have just written down what I verbally just said to you, 'That I will not speak to you anymore outside the group because you are too aggressive towards me." When I leave here, I am going to call Brenda and tell her what I just told you." He responded by saying, "Why are you doing that?" I said no more, picked up my bag and left.

(Ex. 6)

      11.    At 7:15 a.m. on November 6, 2009, Campbell sent an email to Taylor

with a subject line: Chaplain Resident Complaint. In the email, Campbell

complained about his supervisor, Wallace. In the final paragraph, Campbell wrote:

Over the past two weeks and, more recently, since Tuesday (Nov 3) of this week Chaplain Wallace has engaged in destructive conduct with the intent of having me removed from the CPE program. In my opinion, her actions demonstrate gross professional misconduct and include: harassment, gender discrimination, breach of confidentiality, creating a hostile work environment,

abuse of authority, and use of intimidation.  Consequently, at this time, it is questionable whether she will be effective as my CPE supervisor.[5]

(Ex. 3)

12.   Events that occurred later in the day on November 6, 2009, compelled Cary Young to file a "Report of Contact" (VAF-119) regarding Campbell's behavior in the Chaplain residents office regarding the Fort Hood shooting.[6]  Young wrote in her Report of Contact:

> I am writing to record the following details of a conversation I was part of at the end of the work day last Friday, November 6, 2009, just prior to 4 p.m. in the Chaplain Residents' office with one of my fellow Chaplains in the JAHVA Chaplaincy Resident program.  At least one and possibly two other people were present for this event.  My hope was that this was just an idle conversation, some things that were said out of emotion that would never be acted upon.  However, given the nature of the comments and the times in which we are living, I understand that this event must be reported.  The recent events at Fort Hood on Thursday, November 5, in which a staff member shot approximately 50 people on base while at work, had just taken place the day before this event.  As Chaplains, many of us saw patients and

---

[5]      In his affidavit relating to the EEO Complaint, Campbell gave a description of his relationship with Wallace:

> Her relationship with me, or mine with her, from the very beginning, it was a theological issue, there were theological issues.  I never had anything against her, personally, and I don't think she had anything against me, personally, she was challenged by my theological positions, and her – I could tell very early in the relationship that she had an agenda to change my beliefs.
>
> And when that wasn't forthcoming – well, she tried very hard to do that, and became more and more antagonistic as I was resistant to that change.  So there was really no personal conflict whatsoever between myself and her, any time there was an issue that arose, it was directly related to my beliefs, or directly related to theology.

(Ex. 13A, 120)

[6]      The Fort Hood shooting was a shooting that took place on November 5, 2009, at Fort Hood, the most populous U.S. military installation in the world, located just outside Killeen, Texas. In the course of the shooting, a single gunman killed 13 people and wounded 29 others. It is the worst shooting ever to take place on an American military base.

staff the next day at JAHVA (Nov 6) who greeted us wanting to discuss this crisis.  Back at our own offices, after such a demanding day, the subject came up amongst the Chaplain Residents.

Chaplain Bernard Campbell stated to no one particular person but to the room that he could relate to the shooter.  He said that he could understand how something like the shooting could happen after a person feels they have not been treated properly by management.  The room became very quiet.  I believe I was the next to speak.  Hoping to see Chaplain Campbell rephrase or modify his comment, I said that I could see perhaps feeling suicidal if one felt totally desperate or isolated in some way or badly treated, but I stated that I could not relate to taking a gun and using it on other people, that I could not understand the kind of violence that would lead anyone to want to hurt people like this.  I even noted that I thought 40-50 people had been victims in the shooting.  A third Chaplain Resident, Chaplain Loreen O'Brien, was also present and she chimed in with comments similar to those I was making.  Our tone in response to Chaplain Campbell at this point could probably best be described as persuasive.  I was hoping he would qualify what he had said and we would move on.

Instead, Chaplain Campbell persisted in his original line and tone of commentary.  He seemed now almost like he was trying to convince the listeners of the shooter's point of view, stating that if a person feels mistreated enough, he (Chaplain Campbell) can see how that sort of shooting can happen.  Chaplain Campbell stated that when management is not respectful of employees, these sort of things happen.

There was no conclusion to the conversation.  My eyes grew wider, but I stopped any further talk.  It seemed like everyone stopped talking about this around then.  At "quitting time," Chaplain Campbell left with our fourth resident, Chaplain Morris, saying a breezy good-bye like nothing had happened.  Chaplain O'Brien and I sat in stunned silence.  Later, we realized we had heard the same things and felt similar reactions.  I was the last to leave our office that evening and as I went home, the incident stayed with me.  I worried about it over the weekend and wondered if it needed to be formally reported.  I was afraid of what I had seen over time as Chaplain Campbell's capacity for anger.  I was scared that I did not know if he would act on such a statement.  I could not conclusively say to myself if this was just talk or something he might act on.  I have seen Chaplain Campbell get very mad.  I just don't know how far he would take it.

(Ex. 7).  This Report of Contact was filed when Chaplain Young returned to work on

or about November 9, 2009. (Ex. 18A, 249).

13.     On November 12, 2009, after the Reports of Contact and Campbell's email to Taylor, Taylor emailed Campbell to advise him that a Professional Advisory Group would convene on November 19, 2009, to hear concerns about Campbell's complaint. (Ex. 13A, 131) (Doc. 1, ¶10).

14.     The Clinical Pastoral Education (CPE) procedures for disciplinary action provide, in pertinent part, that "[w]hen grounds for dismissal are perceived to exist, the CPE Supervisor [in this case, Taylor] will be notified by the person who has the issue with the CPE student.  The Supervisor will then do a preliminary investigation[7] to determine if grounds for dismissal may exist. . . . If grounds for dismissal appear to be present, the CPE Supervisor will refer the situation to the Chair, Professional Advisory Group (PAG) who will convene an investigative panel. The panel will consist of at least three, and no more than five, members of the PAG. The panel will investigate the allegations and make a determination if grounds for dismissal exist.  They will make a recommendation to the CPE Supervisor for one of the following actions: 1) dismissal of the student; [or] 2) grounds for retaining the student. . . ." (Ex. 10, 283)[8]

---

[7]     Campbell claims that this "preliminary investigation" required Taylor to discuss the matters with him before convening the PAG.  There is no such requirement nor is there any criteria for what constitutes a "preliminary investigation." (Ex. 13A, 126)

[8]     Taylor stated in his EEO affidavit that "[b]ased on my assessment of the vehemence with which he [Campbell] was concerned, I felt like [the complaint by Campbell] needed to be heard by more than just myself, and so I arranged the PAG." (Ex. 14A, 160)

15.     On November 19, 2009, a five-member panel of the Professional Advisory Group (PAG) met to hear concerns about Campbell's complaint against Wallace and the other matters of concern raised by the Reports of Contact filed about Campbell.  Taylor was one of the five panel members.  Campbell, Wallace, Young, O'Brien and Morris were all interviewed and given an opportunity to speak to the PAG.  After hearing from each of the witnesses, the PAG voted unanimously to terminate Campbell. (Ex. 14A, 156-160).

16.     Based upon the unanimous recommendation of the PAG, by letter dated November 25, 2009, Campbell was terminated from employment by Taylor. (Ex. 1)  The termination letter stated, in pertinent part:

> After investigation, the recommendation for your dismissal came from the CPE Program Director and the Professional Advisory Group sub-committee. This dismissal is on the grounds of 1 - failure to show your CPE Supervisor the ability to enter the CPE Process learning environment, 2 - posing a threat to peers, 3 - your stated unwillingness to enter the educational environment unless the supervisor limits the process learning to those learning experiences that are approved by you.

> At the request of the VISN 8 CPE Program Director, a sub-committee of the Professional Advisory Group (PAG) for the VISN 8 CPE Program met on November 19, 2009.  In that meeting, the sub-committee was asked to review a number of issues.  These issues included: a) the concerns of your CPE Supervisor, Chaplain Brenda P. Wallace, over your ability to enter the educational environment and culture of learning as is required by the VISN 8 CPE Program and the Association for Clinical Pastoral Education, Inc., b) the two (2) Reports of Contact submitted by two different peers in your CPE Residency group, and c) your Chaplain Resident Complaint against your CPE Supervisor.

(Ex. 1)

17.     The termination letter went on to conclude that Campbell's CPE Supervisor (Wallace) had voiced concerns to the CPE Program Director (Taylor) and to the PAG that "Campbell refused on every occasion to engage the CPE

process and refused to follow directions specific to his learning." (Ex. 1) The termination letter detailed the specific standards for learning in the CPE program that Campbell had failed to meet, including "Pastoral Formation," "Pastoral Competence" and "Pastoral Reflection."[9] (Ex. 1)

18.     Further, the termination letter concluded that with respect to the two Reports of Conduct, Campbell's "behavior has been destructive and threatening to others in the program as sited [sic] in the Personnel Contact forms filed against [him]."  The letter continued, "[i]n one, you positioned yourself in a manner to block

---

[9]     ***Pastoral Formation***
309.1 to develop students' awareness of themselves as ministers and of the ways their ministry affects persons.
309.2 to develop students' awareness of how their attitudes, values, assumptions, strengths, and weaknesses affect their pastoral care.
309.3 to develop students' ability to engage and apply the support, confrontation and clarification of the peer group for the integration of personal attributes and pastoral functioning.

***Pastoral Competence***
309.4 to develop students' awareness and understanding of how persons, social conditions, systems, and structures affect their lives and the lives of others and how to address effectively these issues through their ministry.
309.6 to develop students' ability to make effective use of their religious/spiritual heritage, theological understanding, and knowledge of the behavioral sciences in their pastoral care of persons and groups.
309.8 to develop students' capacity to use one's pastoral and prophetic perspectives in preaching, teaching, leadership, management, pastoral care and pastoral counseling.

***Pastoral Reflection***
309.9 to develop students' understanding and the ability to apply the clinical method of learning.
309.10 to develop students' abilities to use both individual and group supervision for personal and professional growth, including the capacity to evaluate one's ministry.

(Ex. 1)

the departure of a female peer in order to continue a heated discussion which she wished to bring to an end.  During that discussion you then attacked her character and personhood.  In a second situation, you gave two of your peers the clear impression that you could understand the use of violence in a situation such as that at Ft. Hood when a person, in your opinion, is abandoned by administration.  Both of these exchanges with peers left them concerned over what you were capable of if you were to lose control." (Ex. 1).

19.     Finally, the termination letter concluded that Campbell, in his statements about his CPE Supervisor (Wallace), expressed "that the only way [he] would be able to complete this residency program was to have the CPE Supervisor restrict the training program to those items [he] deemed appropriate."  The letter continued, "You expressed to the PAG that you would expect there to be no discussion of personal theology, your personality or the interaction of these issues in your ministry as part of this post-graduate level theological education."  The letter went on to discuss how Campbell refused to be open to learning, change and growth. (Ex. 1)[10]

20.     On January 26, 2010, Campbell filed an EEO Complaint alleging that he was terminated from the JAHVA CPE Program on November 25, 2009, because

---

[10]     This is consistent with Campbell's statement to the PAG regarding Wallace continuing to supervise him, where he stated, "[b]ut the fact is that some changes will have to be made for the protection of my own interests, as a student and employee, and the integrity of the CPE program as a whole." (Ex. 13A, 134; Ex. 12)   Campbell expected that the CPE program would be changed for him, in that, he would not have to discuss his personal theology, his personality or the interaction of these issues as part of the CPE program.

11

of his race, gender, religious beliefs and as reprisal for the email complaint against his supervisor Wallace. (Ex. 2)  The Complaint was accepted for investigation on March 4, 2010. (Ex. 4).

21.    On April 1, 2009, a Final Agency Decision was issued finding no discrimination in this case. (Ex. 5)  This lawsuit followed.

## MEMORANDUM OF LAW

Summary judgment is appropriately granted, pursuant to Fed. R. Civ. P. 56, where the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A moving party discharges its burden by showing an absence of evidence to support the non-moving party's case. *Id*. at 325.  The burden then shifts to the non-moving party "to go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), Campbell must establish a *prima facie* case of discrimination before proceeding further with his case.  If he can make that showing, the VA has the "exceedingly light" burden of offering a legitimate, non-discriminatory reason for taking the challenged action. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Once Defendant makes that showing, the *prima facie* case falls away, and Campbell, to

12

survive summary judgment, "must meet the reason head on and rebut it[; he] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

### *PRIMA FACIE* CASE OF DISCRIMINATION

In order to successfully allege *prima facie* claims of race, gender and religious discrimination[11], plaintiff must show that he 1) was a qualified member of a protected class, 2) was subjected to an adverse employment action and 3) similarly situated employees outside the protected class were treated more favorably.  See *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005).  For his claim of retaliation, plaintiff must establish 1) that he engaged in statutorily protected activity; 2) that he suffered an adverse employment action; and 3) a causal link between the protected activity and the adverse action.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998).  *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir.2002).

Because of the strong evidence that Campbell was terminated for the legitimate, non-discriminatory reasons set out in detail in his termination letter – particularly his "destructive and threatening" behavior toward others in the CPE Program, for the purposes of this motion, the defendant will assume Plaintiff can establish a *prima facie* case of discrimination (although there is serious doubt

---

[11]     Campbell's Complaint asserts no claim of a "failure to accommodate" theory of religious discrimination nor does he allege any facts to support such a claim. (Doc. 1, paragraphs 33-38)

whether Campbell could even begin to establish a *prima facie* case of discrimination) and proceed directly to meet its burden by demonstrating the reasons for taking the challenged action.

## DEFENDANT HAD LEGITIMATE, NON-DISCRIMINATORY REASONS FOR THE ADVERSE EMPLOYMENT ACTION

If a plaintiff has shown a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its actions. *Aldridge v. Potter,* No. 8:08-CV-2034-T-30EAJ, 2010 WL 1417642 (M.D. Fla. April 8, 2010) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)). The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.*; *Chapman*, 229 F.3d at 1024. The record amply demonstrates the legitimate, non-discriminatory reasons for Campbell's termination.

The most straightforward reason for termination was that Campbell had engaged in threatening behavior toward others on two separate occasions, within just a few days, as set forth in detail in the two Reports of Contact considered by the PAG. The first Report of Contact by Loreen O'Brien, regarding Campbell's abusive and threatening conduct in the chaplain students' room on November 3, 2009, was more than sufficient, by itself, to terminate Campbell. The second instance of conduct, occurring within the same week, reported threatening and highly disturbing statements made by Campbell on November 6, 2009, regarding Campbell being able to relate to the Ft. Hood shooter. This conduct alone is more than sufficient reason to terminate Campbell. See e.g. *Gaston v. Home Depot USA*, 129 F. Supp.

14

2d 1355, 1372 (S.D. Fla., 2001)("inability to get along with co-workers and . . .

caustic or rude behavior is a legitimate, nondiscriminatory reason for an employment

decision."); *Adeniji v. Administration for Children Services, NYC*, 43 F.Supp.2d 407

(S.D.N.Y.,1999) (improper, aggressive and threatening behavior legitimate reason

for termination); *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir.1996) (An

employee's disruptive conduct is a legitimate reason for termination.); *Kahn v.*

*United States Secretary of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (improper

conduct toward coworkers and supervisors was legitimate reason for termination);

*Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1254 (8th Cir. 1981) (insubordination

and threatening language were legitimate reasons for disciplinary action).

  The second legitimate, non-discriminatory reason was that Campbell refused

to engage in the CPE process and refused to follow directions from his supervisor

specific to his learning.  In other words, he was insubordinate and refused to engage

in the learning process.  The "Admissions Policy" for the CPE program provides that

"[a]t all levels, the CPE student needs to sustain sufficient physical and emotional

health to deliver pastoral care.  The student must demonstrate the capacity to

consistently establish and maintain relationships at significant levels and *be open to*

*learning, change and growth.*"  (Ex. 8)  Campbell failed to be open to learning

change and growth and failed to meet the standards of the CPE program for

pastoral formation, competence and reflection.  See paragraph 17 of this motion.

Campbell was terminated for failing to follow the instructions of his supervisor

regarding the CPE program. *Thomas v. Miami Veterans Medical Center*, 2008 WL

3906836 (C.A. 11 (Fla)) (failure to follow supervisory instructions, wilful resistance to

the instructions and disrespectful conduct were legitimate and non-discriminatory

reasons); *DiSantis v. Morgan Properties Payroll Services, Inc.*, 2010 WL 3606267 *8

(E.D. Pa., Sept. 16, 2010) (failure to follow instructions is a legitimate,

non-discriminatory reason).

      The third legitimate, non-discriminatory reason for Campbell's termination

was that he refused to continue in the CPE program unless he was able to dictate

limits on his supervisor's ability to engage him in the process of learning. As the

termination letter explained, Campbell expressed that the only way he would be able

to complete the residency program was to have his supervisor, Wallace, "restrict the

training program to those items [Campbell] deemed appropriate." (Ex. 1) A student

cannot dictate to his instructor what will be required under the training program.

This was yet another legitimate, non-discriminatory reason to terminate Campbell.

## III.   PLAINTIFF CANNOT SHOW THAT DEFENDANT'S STATED REASONS WERE A PRETEXT FOR DISCRIMINATION

      Having articulated legitimate non-discriminatory reasons for the termination of

Plaintiff's employment, "the presumption of discrimination is eliminated and the

Plaintiff must put forth evidence sufficient to permit a reasonable factfinder to

conclude that the reasons given by the employer were not the real reasons for the

adverse employment decision," but rather pretextual. *Chapman*, 229 F.3d at 1024.

If the employer proffers more than one legitimate, nondiscriminatory reason, the

plaintiff must rebut each of the reasons to survive a motion for summary judgment. *Id.* at 1037.  Ultimately, an employer's legitimate, nondiscriminatory reason is not a pretext for discrimination unless it is shown *both* that the reason was false *and* that discrimination was the real reason.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993); *Brooks v. County Commission of Jefferson County, Alabama*, 446 F.3d 1160, 1163 (11th Cir. 2006).  The Plaintiff always carries the "ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

In addition, the Eleventh Circuit has held that a plaintiff cannot demonstrate that the employer's proffered reason was pretextual merely by calling into question the wisdom of the employer's decision; rather, the plaintiff must "meet that reason head on and rebut it" with evidence of discrimination. *Chapman*, 229 F.3d at 1030. Courts do not act "as a super-personnel department that reexamines an entity's business decisions"; rather, they limit their inquiry to "whether the employer gave an honest explanation of its behavior."  *St. Mary's Honor Ctr.*, 509 U.S. at 515 (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991)).  To rule in favor of the Defendant, this Court "need not determine that the [Defendant] was correct in its assessment of the employee's performance; it need only determine that the [D]efendant in good faith believed plaintiff's performance to be unsatisfactory." *Elrod*, 939 F.2d at 1470; *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an

17

honest one."). "We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999).

Plaintiff cannot show that Defendant's stated reasons were false or a pretext for retaliation. Campbell's claims of racial, gender and religious discrimination rely on alleged statements made by his supervisor, Wallace, during the learning sessions in the CPE program. Wallace became frustrated with Campbell's rigid inability to accept another view of an issue. (Ex. 15A, 174-175) For example, Campbell's belief that God is man is his own belief with he holds steadfastly to. Yet, to be able to provide pastoral care to any veteran who Campbell might have to minister to, Campbell could not impose his belief on that person. Telling a veteran in his care who may believe that God is a woman, that God is a man, would not be acceptable ministry. Campbell refused to engage in the learning process.

Campbell's allegations of discrimination on the part of Wallace include several instances of alleged statements which Campbell will argue show discriminatory intent. For example, on October 22, 2009, Wallace allegedly said to Campbell, "[a]while ago, you referred to God as a he. Where does that leave us women? What if we had men in our lives that hurt us, how do we relate to God?" (Ex. 13A, 129) The context of this alleged statement was in the learning environment of the CPE students. In response, Campbell allegedly said, "I wasn't

thinking about that, I was giving you testimony from my perspective about my God, using the language that I use in my faith tradition." Wallace replied, "So don't you have a responsibility to consider your audience and use pluralistic language," to which Campbell replied, "If this were a public audience, yes, but it is not. I am referring to my testimony, I'm referring to my own testimony to a group of theological experts that understand my tradition, so I use the language that's personal to me. Wallace replied, "but you are in a learning environment with four women. How are we supposed to feel, are you sensitive to that." Campbell replied, "I would expect each of you to understand and to respect that I am speaking from my tradition." (Ex. 13A, 129) Because, within the confines of the learning process of the CPE program, Wallace challenged Campbell to be more sensitive to others, Campbell claims religious discrimination.

Further, Campbell claims that on Tuesday, October 27, 2009, in Chaplain Wallace's office, that Wallace said to Campbell, "Have you ever thought that I am harder on you because you are a man, the only Black male among three White women. What do you think would happen if I were to push them like I do you." (Ex. 13A, 128) Wallace denies that this conversation ever happened. (Ex. 15A, 176) Campbell claims this was racial and gender discrimination because he understood this to mean that she could treat him unfairly because he was African-American and male. (Doc. 1, ¶42).

On October 30, 2009, the discussion related to using the male pronoun

19

relating to God continued.  The discussion apparently turned to male authority.

Campbell said, "I believe what the Bible teaches, that the husband is the head of the

wife."  According to Campbell, Karen Morris jumped up and leaned to within inches

of Campbell's face and shouted, "That's what my husband told me every time he

beat the crap out of me."  Morris apparently ran out of the room. (Ex. 13A, 130)

Campbell claimed, with regard to this exchange, "So, basically, I was antagonized

by the group because of my theological position, which the supervisor, Chaplain

Wallace, was leading the discussion, and so that's why I know that it was

theological." (Ex. 13A, 130)[12]

     Further, on November 13, 2009, Campbell alleges that Wallace said to him

"[j]ust because you carry your testicles in the scrotum on the outside of your body,

do you think that gives you the right to say that." (Ex. 13A, 129)  Wallace claimed

that Campbell was very insubordinate. (Ex. 15A, 174)   Wallace claimed that in a

training class she asked Campbell to think of three ways that he might use his own

theology differently in how he interacted with his peers.  At that time, Campbell

refused and stood up over her in a way that was threatening and said he was not

---

[12]     Campbell later claimed that this contact with Chaplain Morris was threatening and
that she was not discipline for her behavior.  First, none of the other participant-witnesses to the
meeting corroborate Campbell's description of the conduct of Chaplain Morris.  Morris denies that
she was threatening. (Ex. 17A, 227) Wallace claims that Campbell was "in a ranting mood" and
that Morris was not threatening. (Ex. 15A, 177)  O'Brien said that Campbell's "voice started to
escalate" and he was "pointing his fingers at the group."  She claimed Morris was not threatening.
(Ex. 16A, 204-205) Young claimed that Campbell's tone while he was speaking "became much
more aggressive and loud," (Ex. 18A, 243) and that Campbell's claims about Morris being
threatening "never happened." (Ex. 18A, 244)  Second, Campbell filed no Report of Contact with
respect to this alleged "threatening" behavior.

going to do that. (Ex. 15A, 174-175)   Wallace claimed that at that point she said,

"just because my balls are not on the outside of my body does not mean that I don't

have them."[13] (Ex. 15A, 176)  Cary Young stated that during a group discussion,

Campbell "went into what can only be described as a rant," that God had ordained

men as the head of the church and the family. (Ex. 18A, 242)  Young further claimed

that Wallace "made the comment she did out of a moment of a lot of anger and

frustration," adding that "we had been trying to handle this rationally with him and

help him see that even his attitude was prejudiced against men and was very hurtful

to our patients here.  But he just couldn't see that at all." (Ex. 18A, 243)

Campbell further claims that he was retaliated against by Taylor because, he

alleges, Taylor convened a PAG meeting *after* Campbell sent an email (the alleged

protected activity) to Taylor complaining about Wallace on November 6, 2009.[14]

Campbell apparently discounts that the reports of Contact involving his threatening

behavior from November 3 and November 6, along with his continued conflict with

his supervisor and his failure to engage in the learning process, provide more than a

sufficient basis for Taylor to convene the PAG.  The PAG determined that one of the

reasons Campbell should be terminated was because he expressed to the PAG that

---

[13]     While Defendant believes that Wallace could have used other words to describe her frustration with Campbell or in this case to project that she would not be intimidated by Campbell's conduct, her statement, however emotive, was not discriminatory.

[14]     Campbell also apparently believes that because the termination letter refers to the fact that the PAG was asked to review the email complaint that he filed against Wallace, that that is somehow indicative of retaliation by Taylor.

21

the only way he would be able to continue in the CPE program was if Wallace, his supervisor, was restricted in her supervision by those items Campbell deemed appropriate.  There is no evidence to support Campbell's claim that he was terminated because he complained about his supervisor.  Moreover, there is no evidence that Taylor had any animus toward Campbell or that the PAG was convened in retaliation for Campbell sending Taylor an email about Wallace.

Most important to the analysis of pretext is the fact that the ultimate decision to terminate Campbell, for all of the reasons set forth in the termination letter, was made by a unanimous recommendation of the PAG, after an independent investigation that included testimony from Campbell, Wallace, O'Brien, Young and Morris.  While Taylor was a member of the PAG, the recommendation came from the entire panel – four other members – that Campbell should be terminated.  Even if Campbell could show some discriminatory animus on the part of Wallace or Taylor, the causal link between the animus and his termination is broken by the PAG's hearing and independent decision to terminate him.  "When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff must not benefit from the inference of causation that would arise from their common identity."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).  Hence, under this first argument, Campbell cannot prevail, even if he could show discriminatory animus on the part of Wallace or Taylor.

Next, with respect to the Reports of Contact considered by the PAG, neither

22

involves information communicated by Wallace or Taylor, or conduct by them. Considered on their face by the PAG, these reports were more than sufficient legitimate, non-discriminatory reasons to terminate Campbell. Campbell claimed that his behavior, as set forth in the November 3, 2009 Report of Contact by O'Brien, was not true. Campbell further claimed that with respect to the November 6, 2009 Report of Contact by Young, regarding his understanding the use of violence at Ft. Hood, these were statements "taken out of context."

Campbell can argue all he wants that the Reports of Contact were fabricated or his statements were taken out of context, but those contentions do not undermine management's reasons for taking action; they do nothing to show pretext or that the removal was a ruse to terminate Campbell because of some discriminatory reason. Moreover, Campbell's assertion overlooks that "a mistaken but honestly held belief on the part of an employer may defeat a claim of employment discrimination." *Reilly v. Novartis Pharmaceuticals Corp.*, 2008 WL 795322 at *12 (M.D. Fla., March 24, 2008). As the Circuit observed in *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991), "[w]e can assume for purposes of this opinion that the complaining employees . . . were lying through their teeth. The inquiry of the ADEA is limited to whether [the employer] believed that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge." In this case, the PAG obviously believed that O'Brien's description of Campbell's threatening behavior was true and that Campbell's statements regarding the Ft. Hood shooter

were not taken out of context.  Had the PAG credited *either* one of these reports as

true, it provided sufficient evidence to terminate Campbell.

Next, Wallace's alleged statements to Campbell do not constitute direct

evidence of discrimination.  Campbell claims Wallace's statements demonstrate

discriminatory behavior directed toward him, but the fact that Wallace was not

involved in the decision to terminate Campbell, negates the probative value of these

statements as it relates to any alleged discriminatory intent on the part of the VA.

Wallace played <u>no</u> part in the decision to terminate Campbell.  See *Standard v.*

*A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (Remarks by non-

decisionmaker or remarks unrelated to the decisionmaking process itself are not

probative of a discriminatory intent.); *Brown v. Northside Hospital*, 2009 WL 282058

(C.A. 11 (Ga.)) (comments of immediate supervisor who was not involved in the

decision to terminate plaintiff did not constitute direct evidence of discrimination.);

*McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("[S]tatement

by an intermediate level management official is not indicative of discrimination when

the ultimate decision to discharge is made by an upper level official.").  Nor can

Campbell benefit from the "cat's paw" theory of causation in which a plaintiff shows

that the decisionmaker followed the biased recommendation of a non-decisionmaker

without independently investigating the complaint against the employee and the

recommender is using the decsionmaker as a mere conduit, or "cat's paw" to give

effect to the recommender's discriminatory animus.  See *Stimpson*, 186 F.3d at

1332 (explaining the "cat's paw" theory.)  The PAG conducted an independent hearing to investigate Campbell's complaint about Wallace, Campbell's ability to continue in the CPE program and the two Reports of Conduct filed about Campbell's threatening behavior.  Wallace was one of five witnesses and had no involvement in the ultimate recommendation of the PAG that Campbell should be terminated.

Finally, Campbell cannot point to any similarly situated employee who was treated differently than he was treated.  In order for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, a plaintiff must show that all of the relevant aspects of his employment situation are virtually identical to those of the other employees who he alleges were treated more favorably.  See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984). Campbell's only claim with respect to this is that Karen Morris was not disciplined for "verbally assaulting" Campbell on October 30, 2009. See footnote 9, in this motion.  While Campbell and Morris occupied the same position as chaplain students, there is nothing else that is similar about them. Campbell did not file a Report of Contact, as he should have if he believed Morris' behavior toward him was threatening, nor is there any information that Morris was not working well in the other aspects of the CPE program.

## CONCLUSION

Based on the foregoing, it is respectfully requested that this Court enter summary judgment in favor of Defendant, pursuant to Fed. R. Civ. 56.

Respectfully submitted, this 7th day of January 2013.

ROBERT E. O'NEILL
United States Attorney

By:   s/ Jeffrey S. Downing
JEFFREY S. DOWNING
Assistant United States Attorney
USAO No. 010
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile:   (813) 274-6198
E-Mail:  jeff.downing@usdoj.gov

26

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 7, 2013, I filed the foregoing document

with the Clerk of the Court, and a copy of the foregoing document was sent by

regular mail to the following non-CM/ECF participant:

> Bernard F. Campbell
> 1703 Cresswell Manor Ct.
> Dover, Florida 33527

> *s/ Jeffrey S. Downing*
> JEFFREY S. DOWNING
> Assistant United States Attorney